305 S.E.2d 294

**STATE of West Virginia**

v.

**Michael Dean EASTER.**

**No. 15695.**

Supreme Court of Appeals of West Virginia.

July 5, 1983.

Pepper & Nason and Andrew S. Nason, Charleston, for appellant.

Chauncey H. Browning, Atty. Gen. and Silas B. Taylor, Asst. Atty. Gen., Charleston, for appellee.

PER CURIAM:

The appellant, Michael Easter, and Robert Rathburn were jointly indicted by a grand jury in Boone County for the June 1980 murder and aggravated robbery of Dale Cobert. Rathburn cooperated with the authorities and was permitted to plead guilty to second-degree murder in exchange for his testimony against Easter. After a seven-day jury trial, Easter was found guilty of second-degree murder and petty larceny.

Easter included a motion for a new trial in his petition for an appeal. His motion was based on newly-discovered evidence, consisting of an affidavit by Rathburn recanting his trial testimony. We granted a hearing before a circuit court judge who denied the motion based on a finding that Rathburn's recantation was fabricated. Easter now appeals his convictions and the denial of his motion for a new trial.

Easter's primary contention is that his written confession and two additional statements containing incriminating information were obtained and used against him in violation of the Federal Constitution's Fifth and Fourteenth Amendments and Article 3, § 5 of the West Virginia Constitution. Because we believe this assignment of error has merit and requires reversal, we will not discuss the other issues raised and will set out the facts only to the extent necessary to establish the context in which the Fifth Amendment issues in this case arose.

## I

During the early morning hours of June 4, 1980, Dale Cobert was stabbed to death. Who stabbed him—Easter or his co-defendant Rathburn—was the critical issue in dispute at trial. Easter testified that the

victim hit him in the face and knocked him unconscious, and that when he regained consciousness Rathburn was telling him that he had just killed the victim. Easter's cousin corroborated his version of the event, stating that he saw Rathburn repeatedly stab the victim, then shake Easter until he regained consciousness and tell him that he had just killed the man. The victim's body was discovered at about 5 p.m. on June 5, 1980.

By the next day, two state troopers conducting the investigation had come to believe that Easter and Rathburn were the last two people to see the victim alive. At about 1:00 p.m. the troopers drove to Easter's house in Boone County and asked him whether he would be willing to submit to a polygraph examination at the state police barracks in South Charleston. A polygraph examination had already been arranged for Rathburn, who was in the cruiser with the troopers when they arrived at Easter's house. Easter immediately agreed to take the examination and entered the police cruiser.

Upon arrival at the state police barracks, Easter was left sitting in the upstairs lobby while Rathburn was taken downstairs for the lie detector test; however, even before Rathburn took the test he made incriminating statements implicating both Easter and himself in the killing. One of the troopers then handcuffed Easter to the chair he was sitting in and returned to question Rathburn briefly.

A short time later, the troopers transported Easter and Rathburn to the Boone County Courthouse in Madison, West Virginia, where they were taken before a magistrate. Arrests warrants were issued and the magistrate advised Easter of the charges against him and informed him of his rights as required by *W. Va. Code*, 62–1–6. Afterward Easter signed a standardized magistrate form acknowledging that he had been informed and understood the charges against him and his constitutional rights.

Although he checked a box on the magistrate's form indicating that he had already obtained counsel to represent him, Easter did not in fact have an attorney. According to suppression hearing testimony, Easter advised the magistrate that he would want, or probably would want, an attorney appointed for him. The magistrate testified that Easter did not say that he wanted an attorney appointed at that time. Easter did not file a pauper's affidavit.

Easter was taken directly from the magistrate's office to the Boone County jail and was fingerprinted, photographed and taken to an interrogation room. Trooper Blankenship testified that he advised Easter of his rights as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that Easter then signed a written form waiving his rights and made a lengthy confession. Although Trooper Blankenship stated Easter signed a written waiver of his rights at that time, no written waiver was introduced at trial. In any event, Easter confessed to the crime about a half-hour after his presentment to the magistrate.

At 2:02 a.m. the following morning, Trooper Blankenship had the Boone County jailers bring Easter to a conference room. At this time Easter signed a waiver of rights form and made a one-page statement concerning what he did after the killing occurred. Trooper Blankenship also interrogated Easter later that day and again Easter signed a waiver and made a brief statement relating to his actions after the homicide.

## II

■ It is now a settled rule of federal and state constitutional law that:

" 'Once a suspect in custody has expressed his clear, unequivocal desire to be represented by counsel, the police must deal with him as if he is thus represented. Thereafter, it is improper for the police to initiate any communication with the suspect other than through his legal representative, even for the limited purpose of seeking to persuade him to reconsider his decision on the presence of counsel.' Syllabus Point 1, *State v. McNeal*, 162 W.Va. 550, 251 S.E.2d 484 (1978)." Syllabus Point 1, *State v. Louk*,

171 W.Va. 639, 301 S.E.2d 596 (1983); *see also* Syllabus Point 4, *State v. Persinger,* 169 W.Va. 121, 286 S.E.2d 261 (1982); *State v. Sowards,* 167 W.Va. 896, 280 S.E.2d 721 (1981); *State v. Clawson,* 165 W.Va. 588, 270 S.E.2d 659 (1980).

 As we said in syllabus point 1, 2, and 3 of *State v. Bradley,* 163 W.Va. 148, 255 S.E.2d 356 (1979):

"1. When a criminal defendant requests counsel, it is the duty of those in whose custody he is, to secure counsel for the accused within a reasonable time. In the interim, no interrogation shall be conducted, under any guise or by any artifice. W.Va. Const. Art. 3, § 5, and W.Va. Const. Art. 3, § 14."

"2. If after requesting counsel an accused shall recant his request, there is a heavy burden upon the state to prove his waiver of right to counsel."

"3. There can be no interrogation of a person accused of committing a crime after he requests counsel, until counsel is provided except that if the suspect recants his request before counsel can be provided with reasonable dispatch, interrogation may be conducted."

We noted in *Louk, supra,* that the United States Supreme Court recently not only reaffirmed its landmark *Miranda* decision in *Edwards v. Arizona,* 451 U.S. 477, 484–5, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378, 386 (1981), *rehearing denied,* 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984, but also afforded additional protection to an accused once he has asserted his right to have counsel present during custodial interrogation. Justice White, speaking for a six-member majority, stated:

" '[W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.' "* (emphasis supplied)

*See also, Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405, (1983) (defining "initiate" for purposes of *Edwards* ).

Easter contends that he was interrogated after he had twice requested an attorney and that the use of his confession against him at trial therefore violated his federal and state constitutional rights. The critical factual question here is whether Easter requested an attorney when he was handcuffed to a chair at the state police barracks. If he did, his confession and subsequent statements should have been suppressed. One request is enough. If he made that request for counsel, we need not address the Fifth Amendment significance of the trial court's finding that Easter told the magistrate that he would probably want an attorney appointed at some point, but mistakenly checked the box indicating he had already obtained counsel. Nor need we consider the Sixth Amendment implications arising from the fact that Easter was interrogated in the absence of counsel after he was formally charged. *See, State v. Gravely,* 171 W.Va. 428, 299 S.E.2d 375 (1982); *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

 The evidence is easily summarized. Easter testified during the suppression hearing that when he was handcuffed to a chair at the state police barracks in South Charleston he told Trooper Totten that he wanted to see a lawyer. Easter said he did not recall any other person being present at that time and that Trooper Totten responded by saying "Well, sit there and keep your mouth shut then and don't say a word to nobody."

Trooper Totten did not testify during the suppression hearing on behalf of the State. Trooper Blankenship testified that Trooper Totten took his handcuffs and in his presence handcuffed Easter to the chair. Trooper Blankenship went on to testify as follows:

"Q. Was there any conversation between Trooper Totten and Michael Easter? Between you and Michael Easter? Michael Easter and anyone else at that time?

"A. No, sir, not that I can remember. I know I didn't say anything to him.

. . . . .

"Q. But you don't recall when the handcuffs were placed on Michael Easter that he, at that point, asked if he could have a lawyer?

"A. No, sir.

"Q. You can't recall any conversation at all, at that point?

"A. No, sir, I don't."

At the conclusion of the suppression hearing, the trial court found that Easter had indicated to the magistrate that he would want an attorney appointed at some time, but upon being advised of his constitutional rights on at least two occasions, waived his right to remain silent and to the assistance of counsel. In response to the following question by Easter's counsel, the court and prosecutor said:

"MR. HICKOK: Is it the Court's finding that the preponderance of the evidence is that he did not make known his desire to have counsel while he was at the State Police Headquarters in South Charleston?

"THE COURT: He can't specifically say that never happened. Yes, I'm going to find that, from a preponderance of the evidence as far as the State Police Barracks—

"MR. BOULDIN: What I might tell the Court, we are prepared to offer testimony from Trooper Bob Blankenship and Dempsey Totten that, when the handcuffs were placed on Michael Easter, both of these officers were present and nothing was said. So, either of them are prepared to offer evidence in support."

We conclude that the trial court was clearly wrong in finding the preponderance of the evidence supported a finding that Easter did not tell the troopers he wanted a lawyer at the state police barracks. Easter said he told Trooper Totten he wanted a lawyer. Surprisingly, Trooper Totten did not testify on this point and thus we do not have "the almost inevitable 'swearing contest' over what happened behind the closed doors." Y. Kamisar, W. LaFave & Israel, Modern Criminal Procedure 513 (4th Ed. 1974). Trooper Blankenship could only testify that he did not recall whether Easter asked for a lawyer. He could not remember any conversation at all taking place at that point. Easter's testimony stands nearly unrefuted, as no other witness testified on the point.

Consequently, we find as historical fact that Easter requested an attorney while at the state police barracks in South Charleston. As a matter of federal and state constitutional law, Easter was entitled to be free from custodial interrogation in the absence of counsel. He did not initiate any dialogue with the authorities; instead he was deliberately interrogated. Easter's confession and subsequent statements, being fruits of an illegal custodial interrogation initiated by the police, were not admissible in evidence against him. We can not say this constitutional error is harmless beyond a reasonable doubt.

For the foregoing reasons, Easter's convictions are reversed and set aside and the case is remanded for a new trial.

Reversed and remanded.